NOT RECOMMENDED FOR PUBLICATION
File Name: 07a0754n.06
Filed: October 24, 2007

No. 05-6776

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

CARL WAYNE MARCO,

    Defendant-Appellant.

_____/

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

BEFORE:    BATCHELDER and GILMAN, Circuit Judges; and STAFFORD,[*] District Judge.

**STAFFORD, District Judge.** The defendant, Carl Wayne Marco ("Marco"), appeals his jury conviction and 188-month sentence for conspiracy to distribute and to possess with the intent to distribute methamphetamine. We **AFFIRM**.

## I. BACKGROUND

On March 8, 2005, Marco and his girlfriend, Angela Bryant ("Bryant"), were charged in a one-count indictment with conspiring to distribute, and to possess with the intent to distribute, 50 grams or more of methamphetamine in violation of 21 U.S.C. § 846. While Bryant pleaded guilty and became a cooperating witness for the prosecution, Marco was convicted by a jury of the charged offense.

At trial, the government called Investigator William Gregg ("Gregg"), of the Washington

_____

[*] The Honorable William H. Stafford, Jr., Untied States District Judge for the Northern District of Florida, sitting by designation.

County Sheriff's Department ("WCSD"), who arrested Marco on the night of February 1, 2005. Gregg explained that, at approximately 9:45 that evening, while he was staking out the residence of a man arrested earlier in the evening on drug trafficking charges, a man driving a black Corvette stopped at the residence, approached the door of the residence carrying a small bag, then returned to his car when no one answered the door. Believing that he had witnessed an unsuccessful drug transaction, Gregg began following the Corvette. Gregg soon after saw the driver cross the center line of the road several times, causing Gregg to activate his unmarked car's blue lights. Based on the driver's erratic driving, Gregg suspected that the driver might be alcohol-impaired. When the driver failed to stop, Gregg called for assistance from WCSD Lieutenant Brian Horton ("Horton"), who was nearby in a marked patrol car. Horton took over the pursuit of the Corvette no more than a minute later.

Horton testified that his marked patrol car was equipped with spotlights, a siren, top-mounted blue lights, and a video camera. All of the equipment was operating as he pursued the Corvette at speeds of 55 to 65 miles per hour in an area where the speed limit was 40 to 45 miles per hour. During the pursuit, Horton observed the Corvette veer onto the shoulder of the road at least six or seven times. Horton also observed something hit the pavement in front of his cruiser immediately after he saw the driver of the Corvette make a throwing-type motion toward the passenger-side window. While Horton could see that a passenger was in the Corvette, he did not see the passenger throw anything from the car.

After some minutes, Horton and Gregg, along with another officer who had been called to assist, were able to effectuate a stop of the Corvette by using their vehicles to "box in" the Corvette at an intersection. Horton and Gregg thereafter approached the Corvette with guns drawn, ordered

the driver out of the car, then handcuffed him and patted him down. The driver was identified as Marco. During the pat-down search of Marco's person, Horton found approximately $3,216 in cash and a small plastic vial containing a white powdery substance. A small bag containing a pink, crystal-type substance was found during a search of the Corvette. Gregg's field tests on both substances produced positive results for methamphetamine.

Marco was arrested and taken to jail. In the jail, Marco's phone calls were monitored and taped. In particular, Marco had frequent phone conversations with his girlfriend, Bryant, and these conversations were copied onto a CD that was admitted into evidence and played at trial. There was also live testimony from Bryant, who explained her conversations with Marco as the CD was played for the jury. Among other things, Bryant explained that Marco began his first call by asking her to retrieve a paper bag that he had thrown out on the side of the road before his arrest. Marco initially told Bryant that the bag contained "tools" that were worth about "5 to 6,000." Following Marco's directions about where to find the bag, Bryant made one unsuccessful attempt to locate the bag, then, on a second attempt, found a paper bag not far from where Marco was arrested. The bag contained a set of scales and a substantial amount—about six ounces—of what Bryant recognized as methamphetamine.

In another call, after learning that Bryant had retrieved the paper bag, Marco told Bryant to get rid of the six "horses." He also mentioned "feed bags" for the "horses." Bryant explained that "horses" meant methamphetamine, each "horse" representing one ounce of methamphetamine. The "feed bags" referred to the small plastic baggies that she was supposed to use to divide up the six ounces of methamphetamine. Marco told Bryant that she should be able to get $11,000 for the "horses." Bryant, who was a methamphetamine user herself, calculated that six ounces of

methamphetamine should be worth considerably more than $11,000.

During another of his calls from the jail, Marco asked Bryant to retrieve some "tools" from the back of a four-wheeler that was parked outside Bryant's house.[1] In fact, Bryant found a handgun, not "tools," in the back of the four-wheeler. Bryant hid the handgun in the house.

After retrieving the bag of methamphetamine from the side of the road, Bryant took the bag to her residence and hid it in a Crown Royal bag. The next day, not wanting the drugs in the house with her children, Bryant asked a friend, Eddy Presley ("Presley"), to move the drugs from her house. Presley concealed what he thought was all of the methamphetamine in Bryant's hair dryer, then took the hair dryer to the basement of his parents' house. Unbeknownst to Bryant and Presley, a small amount of the methamphetamine was left in Bryant's house in the Crown Royal bag.

A search warrant was executed at Bryant's house several days after Marco's arrest. Bryant was present at the time. Officers found digital scales, manual scales, baggies, marijuana, an H&K .45 caliber semi-automatic pistol (the gun found by Bryant in the back of the four wheeler), cash, and a Crown Royal bag containing approximately one ounce of a crystal-type substance.

The next day, having decided to cooperate with law enforcement, Bryant led Horton and some other officers to Presley's parents' house. After obtaining consent to search the Presleys' house, the officers found a cooler containing a bag, a canister, and Bryant's hair dryer, all of which contained what appeared to be methamphetamine. Bryant later told Marco during a monitored phone call that law enforcement officers had seized the "stuff" in the Presleys' house. Marco responded that the seizure had cost him $11,000.

---

[1] Bryant and her children were living in what had been Marco's residence. Marco himself had moved out of the residence two months earlier.

The substances seized from Marco at the time of his arrest, along with the substances seized from Bryant's and the Presleys' residences, were analyzed by TBI chemist Denise Morrissey ("Morrissey"). Morrissey testified that the substances taken from Marco's person totaled 4.9 grams of methamphetamine, with varying purity levels. The substances taken from the residences totaled 121 grams of pure methamphetamine.

On July 6, 2005, at the conclusion of a one-day trial, a jury found Marco guilty of conspiring to distribute and to possess with the intent to distribute 50 grams or more of methamphetamine. A probation officer thereafter prepared Marco's presentence report ("PSR") using the 2004 version of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). The officer calculated a sentencing range of 151 to 188 months—the result of (1) a base offense level of 32 pursuant to U.S.S.G. § 2D1.1(a)(3)(c)(4) (2004) (setting the base offense level at 32 where the offense involved at least 50 grams but less than 150 grams of methamphetamine); (2) a two-level enhancement for Marco's leadership role in the conspiracy pursuant to U.S.S.G. § 3B1.1(c); and (3) a criminal history category of I pursuant to U.S.S.G. ch.5, pt. A.

Before sentencing, Marco submitted no objections to the probation officer's calculation of the Guidelines range. At sentencing, Marco's counsel urged the court to impose the minimum sentence within the range calculated by the probation officer, but he did not object to the range itself. Mindful that the statutory range of imprisonment was ten years to life, the district court sentenced Marco to a 188-month term of imprisonment. The district court thus imposed a sentence at the top of the range, explaining that, in choosing a sentence within the *advisory* range, it had considered Marco's lack of remorse and lack of acceptance of responsibility. The court also explained that, in its view, Marco's criminal history score understated his actual criminal history. After imposing

sentence and advising Marco of his right to appeal, the district court asked the parties if either had any objections to the sentence that had not already been raised. Through counsel, Marco responded in the negative. This appeal followed.

## II. ANALYSIS

### A.

Marco first contends that Gregg and Horton lacked probable cause to stop him on the day of his arrest. As a result, he says, the evidence seized from his person and his vehicle should not have been admitted at trial. Marco did not file a motion to suppress such evidence, and he did not object to the admission of that evidence at trial. Marco concedes that his claim of error in this regard must be reviewed for plain error.

To establish plain error, Marco must demonstrate (1) that error occurred; (2) that the error was obvious or clear; (3) that the error affected his substantial rights; and (4) that the negative impact affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998).

Marco falls far short of establishing that the district court committed plain error by admitting the evidence seized by Gregg and Horton on the day of Marco's arrest. Gregg testified that he attempted to stop Marco after Marco crossed the center line of the road several times, leading Gregg to believe that Marco was driving under the influence of drugs or alcohol. Marco failed to stop in response to the officers' blue lights and wailing siren and, instead, led the officers on a high-speed chase during which he was seen throwing something from the window of the car. Clearly, Marco's actions provided the officers with probable cause to stop the Corvette and arrest its driver. *See, e.g., United States v. Carlton*, 44 Fed. Appx. 720, 722 (6th Cir. 2002) (holding that officer had probable

cause to believe that an individual was driving while impaired based on the individual's "erratic driving"); *Nelson v. Riddle*, 217 Fed. Appx. 456, 460 (6th Cir. 2007) (noting that, where the defendant failed to stop his car when signaled to do so by officers using emergency lights and sirens, probable cause existed to arrest the defendant for fleeing from the police); *United States v. Williams*, 79 Fed. Appx. 677, 682 (5th Cir. 2003) (finding probable cause for a warrantless arrest where the defendant fled from police and was seen discarding an object while fleeing). Marco's arguments to the contrary are without merit.

Furthermore, the law is well-established that an officer may conduct a full search of an arrestee's person during the course of a lawful arrest. *United States v. Robinson*, 414 U.S. 218, 234-35 (1973) (holding that "in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment"); *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004) (explaining that "[u]nder the 'search-incident-to-a-lawful-arrest' exception to the warrant requirement, a law enforcement officer may conduct a full search of an arrestee's person incident to a lawful custodial arrest"). In addition, an officer may search a vehicle incident to the lawful custodial arrest of a recent occupant of that vehicle. *See, e.g.*, *Thornton v. United States*, 541 U.S. 615, 623-24 (2004) (holding that "[s]o long as an arrestee is [a] . . . 'recent occupant' of a vehicle . . . , officers may search that vehicle incident to the arrest"). Because, in this case, the officers had probable cause to arrest Marco based on his erratic driving, his attempts to flee despite the officers' clear signals to stop, and his act of discarding an object from his vehicle during that flight, the incident-to-arrest searches of Marco's person and vehicle were proper. The district court did not err, much less commit plain error, when it admitted the methamphetamine seized during those searches.

**B.**

Marco next contends that the district court erred when it admitted into evidence the methamphetamine that was seized from the two residences. Again, because he neither objected to this evidence at trial nor filed a pre-trial motion to suppress, Marco concedes that we must review this claim for plain error.

According to Marco, it was "impossible for anyone, even Angela Bryant, to testify with any certainty that the drugs she allegedly recovered from the side of the road were the same drugs that were recovered as a result of the searches by police." Appellant's Br. at 28. Marco points to two alleged breaks in the "chain of custody." First, there was purportedly nothing to establish that the bag of methamphetamine found by Bryant on the side of the road was the bag thrown by Marco from his car several days earlier; and second, there was purportedly nothing to prove that the methamphetamine found in the Presleys' house was the methamphetamine that was removed from Bryant's house days earlier. According to Marco, the evidence was admitted without proper "authentication" because the breaks in the "chain of custody" precluded Bryant from knowing whose drugs were whose.

In *United States v. Brown*, No. 96-3074, 1996 WL 487597, *4 (6th Cir. Aug. 26, 1996) (unpublished decision), this court reversed the district court's decision to exclude two bags of cocaine on chain-of-custody and authentication grounds. The bags of cocaine in *Brown* were found two weeks after, and near the location where, the defendant abandoned his vehicle following a high-speed chase by police officers. The district court excluded the bags of cocaine, finding that (1) there was an insufficient link between the defendant and the two bags containing the evidence; and (2) the government could not prove that the bags remained intact from the time they were reportedly seen

in the defendant's possession until they were found some two weeks later. The appellate court rejected the district court's chain-of-custody and authentication analysis, finding that the issue boiled down to one of relevance—an issue that goes to the weight of evidence and not its admissibility.

As the court did in *Brown*, this court finds Marco's chain-of-custody and authentication arguments inapposite. Instead, his argument "boils down to an assertion about the relevance of the evidence." *Id.* at \*3. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Given the drug conspiracy charge against Marco, the methamphetamine found in the Presleys' and Bryant's residences, if linked to Marco, had a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.*

Here, the government, through Bryant, introduced evidence to establish the necessary link between Marco and the methamphetamine found in the two residences. The jurors were entitled to consider that evidence—namely, Bryant's testimony about her conversations with Marco and about what she did in response to those conversations—and to accord it whatever weight they felt appropriate when deciding whether the methamphetamine seized from the two residences was linked, beyond a reasonable doubt, to Marco. The district court committed no error, plain or otherwise, by failing to *sua sponte* suppress the methamphetamine that was seized from Bryant's and the Presleys' residences.[2]

---

[2] In his reply brief, Marco raises an argument not previously made: namely, that there was insufficient evidence to establish Marco's guilt because there was no evidence to corroborate the testimony of his coconspirator, Bryant. Because appellate issues raised for the first time in a party's

**C.**

Marco contends that his conviction cannot stand because 28 U.S.C. § 841(a)(1) does not require, and the government failed to prove, that his conduct affected interstate commerce. Although we normally review constitutional challenges to a statute *de novo*, here we review for plain error because the issue was not raised in the district court. *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001). That there was no plain error is made clear by controlling law. *See United States v. Tucker*, 90 F.3d 1135, 1140-41 (6th Cir. 1996) (noting that (1) that "drug trafficking is an 'economic enterprise' that substantially affects interstate commerce in numerous clear ways;" (2) Congress has the power under the Commerce Clause "to regulate an activity as clearly commercial as drug trafficking;" and (3) a case-by-case jurisdictional finding is unnecessary "where the activity, like drug trafficking, is of a kind that always implicates interstate commercial concerns"); *see also United States v. Collier*, No. 06-5354, 2007 WL 2461870, *13 (6th Cir. Aug. 29, 2007) (unpublished decision) (holding that 21 U.S.C. § 841(a)(1) does not violate the Commerce Clause, on its face or as applied to the defendant, because section 841(a)(1) "addresses a clearly commercial activity that has long been within federal power to regulate") (quoting *Tucker* 90 F.3d at 1140); *United States v. Genao*, 79 F.3d 1333, 1336 (2d Cir. 1996) (upholding section 846 against a Commerce Clause attack, noting that "[b]ecause narcotics trafficking represents a type of activity that Congress reasonably found substantially affected interstate commerce, the actual effect that each drug conspiracy has on interstate commerce is constitutionally irrelevant").

**D.**

---

reply brief are deemed waived, we decline to reach this issue. *United States v. Moore,* 376 F.3d 570, 576 (6th Cir. 2004).

Citing *United States v. Booker*, 543 U.S. 220 (2005), Marco contends that his Sixth Amendment right to a jury trial was violated when the district court made a finding of fact as to his supervisory role in the offense, a finding that increased his advisory Guidelines range but did not cause his sentence to exceed the statutory maximum. Marco did not raise a Sixth Amendment challenge to his sentence before the district court. Accordingly, the plain-error standard of review applies to Marco's Sixth Amendment claim. *United States v. Sosebee*, 419 F.3d 451, 457 (6th Cir. 2005).

This circuit has consistently recognized that judicial fact-finding at sentencing is constitutional, so long as the court recognizes that the Guidelines are advisory and not binding. *See, e.g.*, *United States v. Gardiner*, 463 F.3d 445, 461 (6th Cir. 2006) (noting that "[i]t is clear under the law of this Circuit that a district court may make its own factual findings regarding relevant sentencing factors, and consider those factors in determining a defendant's sentence"); *United States v. Ferguson*, 456 F.3d 660, 665 (6th Cir. 2006) (noting that this court and others have repeatedly held since *Booker* that district judges can find the facts necessary to calculate the appropriate Guidelines range using the same preponderance-of-the-evidence standard that governed prior to *Booker"*); *United States v. Cook*, 453 F.3d 775, 777 (6th Cir. 2006) (noting that "[b]ecause the guidelines are now advisory and not mandatory, a District Court may rely on extra-verdict facts or on those other than which the defendant has specifically admitted when it calculates his sentence"). Here, the district court made clear during the sentencing hearing that it considered the Guidelines to be advisory. Thus, under well-established law, the district court was entitled to enhance Marco's sentence based upon its own factual findings regarding Marco's role in the conspiracy. Marco has utterly failed to establish plain error in this regard.

**E.**

Marco contends that, in sentencing him, the district court failed to discuss the factors set forth in 18 U.S.C. § 3553(a).[3] Because Marco failed to object to the alleged inadequacy of the district court's sentencing rationale, he concedes that this court should review the sufficiency of the district court's sentencing explanation for plain error.

After *Booker* made the Guidelines advisory, district courts have been required to impose "a sentence sufficient, but not greater than necessary to comply with the purposes of § 3553(a)(2)." *United States v. Cage*, 458 F.3d 537, 540 (6th Cir. 2006) (internal quotation marks and citation omitted). A sentence must be upheld on appeal if it is substantively and procedurally reasonable. *Id.* In this case, Marco claims that his sentence was procedurally unreasonable.

---

[3] Section 3553(a) requires the sentencing court to consider the following factors in determining a reasonable sentence:
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed-
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for-
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...
> (5) any pertinent policy statement ...
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

"A sentence may be procedurally unreasonable if the district judge fails to consider the applicable Guidelines range or neglects to consider the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration." *United States v. Jones*, 489 F.3d 243, 250-51(6th Cir. 2007) (internal quotation marks and citation omitted).  Satisfaction of the procedural reasonableness requirement does not, however, depend on a district court's engaging in "a rote listing or some other ritualistic incantation" of those factors. *United States v. Dexta*, 470 F.3d 612, 614-15 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 3066 (2007).  Instead, a sentence is procedurally reasonable if the district court articulates its reasons for a particular sentence "to a sufficient degree to allow for reasonable appellate review." *Id.* at 614.

Here, the district court heard Marco speak at length during the sentencing hearing.  Marco generally criticized the "prejudicial" nature of the PSR; he complained about his attorney's failure to file certain motions for him; he denied that he had thrown any drugs from the car during the high speed chase; he contradicted portions of Bryant's testimony; and he tried to minimalize the extensive criminal history set forth in his PSR.  The district court listened to what Marco had to say, then suggested that Marco had "talked [himself] into some difficulty" with his comments.

While noting that an above-the-Guidelines sentence may have been appropriate given the circumstances of this case, the district court nonetheless selected a within-the-Guidelines sentence,[4] stating that—in selecting such a sentence—it had "considered the nature and circumstances of the offense, the history and characteristics of the defendant, the advisory guideline range established by

---

[4]  A sentence that falls within a properly calculated Guidelines range is credited with a rebuttable presumption of reasonableness. *Rita v. United States*, 127 S. Ct. 2546 (2007)*; United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 3043 (2007).

the United States Sentencing Commission and all the other factors set forth in section 3553(a), pursuant to the Sentencing Reform Act of 1984." In particular, the district court stressed Marco's "total lack of acceptance of responsibility" and "total lack of remorse," findings that were, if anything, confirmed by Marco's comments at sentencing. The court found equally significant Marco's extensive criminal record, the seriousness of which—in the district court's view—was inadequately reflected in the calculation of Marco's criminal history category. While the district court did not enumerate and discuss each of the 3553(a) factors explicitly, it "explain[ed] its reasoning to a sufficient degree to allow for reasonable appellate review." *Dexta*, 470 F.3d at 614. Indeed, because our review of the record reveals that the district court not only considered the relevant statutory factors but also gave a detailed explanation of its reasons for the particular sentence imposed, we reject Marco's argument that the district court committed plain error by failing to adequately explain its sentencing rationale.

F.

Marco contends that, contrary to *Booker*, the district court treated the Guidelines sentencing range as mandatory. He concedes that, because he failed to object at sentencing to the district court's application of the guidelines, this court must review his *Booker* claim for plain error.

At the sentencing hearing, the district court expressly stated—on more than one occasion—that it considered the Guidelines to be advisory in nature. At the beginning of the sentencing hearing, the court announced that the PSR had established "an advisory guideline range of 151 to 188 months." J.A. at 224. It then noted that Marco had filed no objections to the calculation of "the advisory guideline range." *Id.* Later, while explaining that *Booker* required it to consider a number of factors, including "the advisory guideline range established by the United

States Sentencing Commission for the offense of conviction," the court noted that the "advisory guideline range is a factor . . . entitled to substantial weight in the sentencing process." *Id.* at 235-36. Finally, the district court explained that it was imposing a sentence "within the advisory guideline range," despite the fact that—given the circumstances of Marco's case—it could have imposed a sentence above the applicable Guidelines range. *Id.* at 240.  Clearly, the district court recognized that the Guidelines sentencing range was advisory rather than mandatory.

To the extent Marco argues that the district court committed plain error by giving too much weight to the advisory Guidelines range, his argument is frivolous. *See United States v. Davis*, 2007 WL 906332, *6 (E.D. Tenn. March 21, 2007) (explaining that substantial weight is ordinarily given to the advisory Guidelines range); *United States v. Clay*, 2005 WL 1076243, at *1 (E.D. Tenn. May 6, 2005) (holding that the "guidelines, although advisory and only one factor among others to be considered in arriving at a reasonable sentence, are entitled to substantial weight in the sentencing decision").  At the sentencing hearing, Marco acknowledged—through counsel—the correctness of the Guidelines calculation; he did not request a sentence below the advisory Guidelines range; and he did not offer any mitigating facts that would have supported a below-the-Guidelines sentence. Under the circumstances, we cannot fault the district court for giving substantial weight to the Guidelines range.

### III.  CONCLUSION

For the reasons explained above, we **AFFIRM** Marco's conviction and sentence.